## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 22-20161-CR-GAYLES/TORRES

UNITED STATES OF AMERICA,

      Plaintiff,

v.

SILVERIO HENRIQUEZ,
VICTOR MANUEL PENA-ABREU,
YOVANNY JOSE GONZALEZ, and
JEASON ALMONTE-HENRIQUEZ,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION TO DISMISS THE INDICTMENT

      This matter is before the Court on Defendants' joint motion to dismiss the indictment (the "Motion"). [D.E. 29]. The Motion is fully briefed and, after careful consideration of the Motion, the record, the relevant authorities, and for the reasons discussed below, the Court finds that Defendants' Motion should be **GRANTED in part** and **DENIED in part**.[1]

---

[1]     On August 3, 2022, the Honorable Darrin P. Gayles referred the Motion to the Undersigned for a Report and Recommendations. [D.E. 34].

## I.     BACKGROUND

The Court held an evidentiary hearing on January 11, 2023, which was continued on April 4, 2023, due to the Government's inability to produce a material witness in January.  Accordingly, based upon the record before the Court, we make the following findings of fact.

### A.     *The circumstances leading to Defendants' arrest.*

On March 30, 2022, a patrol aircraft detected a go-fast vessel ("GFV") approximately 140 nautical miles south of the Dominican Republic and within that nation's Exclusive Economic Zone ("EEZ").  The *Friesland*, a Dutch naval vessel with an embarked United States Coast Guard law enforcement detachment, was patrolling nearby and diverted to investigate the GFV.

Once in the vicinity, the *Friesland* launched two of its small boats to rendezvous with the GFV.  The small boats soon came upon the GFV, which was traveling no faster that five knots at the time, and so the USCG boarding team was able to confirm that the GFV displayed no indicia of nationality.  The USCG boarding team received authorization from their superiors to conduct a "Right of Visit" boarding (or "ROV" in Coast Guard parlance) to assess the nationality of the GFV and, thereafter, armed USCG officers boarded the GFV.

Defendants peacefully complied with the commands of the USCG boarding team, which resulted in a seizure of the GFV (and therefore Defendants) without any use of force.  After the USCG established control over the GFV, Officer Hernandez, the certified Spanish interpreter on this USCG boarding team, asked Defendants

questions in their native language pursuant to a written ROV checklist that was admitted into evidence at the hearing as Government Exhibit A.

Officer Hernandez first asked the entire group of Defendants whether any of them were the "master" or the "captain" of the GFV. Officer Hernandez received no response, and so Officer Hernandez then asked each Defendant individually whether he was the "person in charge" of the GFV. In response, each Defendant either said "no" or shook his head to indicate that he was not the master of the vessel.

Officer Hernandez then continued down his checklist, asking each Defendant in Spanish whether he wanted to make a claim of nationality for the GFV. In response, each Defendant again either said "no" or shook their head.

Although it was not on the checklist, Officer Hernandez also asked the group of Defendants whether they could identify the GFV's registry. In response, Officer Hernandez was told that there were no documents on board the GFV that would evidence its registry.

Based upon the foregoing responses, the USCG boarding team obtained authorization to treat the GFV as a "stateless" vessel. Thus, after a field test confirmed that the GFV was carrying approximately 500 kilograms of cocaine, Defendants were formally arrested and then transferred to the *Friesland*.

**B.** **The assignment of the case to the Southern District of Florida.**

Defendants remained on the *Friesland* until April 6, 2023. And on that date, a few important events took place.

First, the Department of Justice determined that Defendants' criminal case would be tried in the Southern District of Florida. Second, Defendants were transferred from the *Friesland* to the *Tezanos*, a USCG Cutter, to begin their journey toward our District. And third, Detective Louis Hosch, a DEA Task Force Officer who is based in Miami, was notified that he was the case agent assigned to this case.

Despite being assigned the case on April 6, 2023, however, Detective Hosch did not obtain a criminal complaint against Defendants until April 12, 2023. He confirmed at the hearing that nothing extraordinary contributed to this delay and that, soon after he received his case assignment, he had all the information he needed to file the complaint and to plan his rendezvous with Defendants on April 20, 2023.

### C.   *The unnecessary ship transfers designed to avoid the activation of Defendants' constitutional rights.*

The USCG kept a handwritten log that documents, in approximately 30-minute intervals, the status of Defendants' detention. Defendants were provided with medical care upon their arrival on the *Friesland*. They were given clean clothes, albeit of the plastic variety, as well as a sun hat and sandals to wear. As is typical in cases involving the interdiction of maritime drug traffickers, Defendants were regularly fed and allowed to use the bathroom on request; however, most of their time was spent in shackles on the deck of a ship where they were continuously exposed to the elements and required to sleep on something that resembles a thick yoga mat. There is no dispute that the conditions were, to say the least, not exactly a Caribbean pleasure cruise.

Defendants remained on board the *Tezanos* for only two days before being transferred to the *Billings*, a warship operated by the United States Navy, on April 8, 2023. The following day, Defendants were transferred via helicopter to the *Wichita*, another Naval warship. Then, on April 11, 2023, Defendants were transferred back to the *Tezanos*. This seems odd, until one realizes the underlying reasons for these machinations.

Lieutenant Fujimoto, a USCG staff officer, explained at the hearing that the foregoing transfers were made because the *Tezanos* needed to refuel and restock its supplies in a Puerto Rican port between April 8 and April 11. Defendants were therefore transferred off the *Tezanos* before the ship made port because, if Defendants were on board the *Tezanos* when it entered the territorial seas of the United States, Defendants could then claim enjoy the rights afforded by the United States Constitution. In other words, the reason that Defendants moved from the *Tezanos* to the *Billings* to the *Wichita* and then back to the *Tezanos* was because it is the apparent policy to keep Defendants more than 12 miles away from the United States and remain on international waters until the government was ready for the consequences.

After returning to the *Tezanos*, Defendants were transferred to the *Thetis*, another USCG cutter, on April 15, 2023. The *Thetis* then sailed for Guantanamo Bay, Cuba, where it finally delivered Defendants into Detective Hosch's custody on April 20, 2023.

Lieutenant Fujimoto further testified that it is USCG policy to not deliver a detainee suspected of maritime drug trafficking to anyone other than the assigned case agent. Thus, because the case was assigned to Detective Hosch in the Southern District of Florida on April 6, 2023, there was an additional reason (beyond preventing the activation of Defendants' constitutional rights) that Defendants were removed from the *Tezanos* on April 8, 2023:  The assigned case agent would not be in Puerto Rico to receive them.

Detective Hosch testified that, after he retrieved Defendants from the *Thetis*, he flew them to Fort Lauderdale.  At some point after their arrival on dry land, Detective Hosch interrogated Defendants about their alleged crimes.  Because he did not have access to his notes, Detective Hosch could not recall whether they made any incriminating statements and, if so, what the substance of those statements were. He did confirm, however, that Defendants did make post-*Miranda* statements, that they spent the night in the Broward County Jail, and that they were transported to Miami on April 21, 2023, for their initial appearance before a magistrate judge in the Southern District of Florida.

There is no dispute that there is a federal detention center in Puerto Rico. There is no dispute that there are United States Marshals in Puerto Rico.  There is no dispute that there are DEA agents in Puerto Rico.  And there is no dispute that there are federal magistrate judges in Puerto Rico.  The record therefore reflects that, if the Government wanted to do so, it could have easily brought Defendants before a Judge in Puerto Rico by April 10, 2023, at the very latest.

Nevertheless, the Government made a tactical decision to avoid that potential first appearance because it wanted to give its assigned case agent the opportunity to interrogate Defendants *before* a Judge could advise Defendants of their rights, inform Defendants of the charges against them, and appoint counsel for their defense.

At the hearing, the Government vehemently denied Defendants' accusation that it was "deliberately delaying and protracting travel so that the Government can elicit information from specific defendants because the DEA is being given, to quote counsel, the first bite at the apple." "That I cannot and will never concede because that's just not true," said the prosecutor. But even if these denials are merited, there is at least no denying that the Government tried really hard to avoid bringing Defendants to Puerto Rico. And they did so by instead deploying two Naval warships and one Naval helicopter to keep them in international waters from April 8, 2023, through April 11, 2023, resulting in what we believe to be an unnecessary 11-day delay in Defendants' presentment to a Magistrate Judge.

## II.    ANALYSIS

A motion to dismiss an indictment is governed by Federal Rule of Criminal Procedure 12(b), which allows a defendant to challenge an indictment on various grounds, including failure to state an offense, lack of jurisdiction, or constitutional reasons. *See United States v. Kaley*, 677 F.3d 1316, 1325 (11th Cir. 2012). Moreover, a motion that the court lacks jurisdiction may be made at any time while the case is pending. *See* FED. R. CRIM. P. 12(b)(2).

An indictment "may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *United States v. Torkington*, 812 F.2d 1347, 1354 (11th Cir. 1987). Further, "[t]he sufficiency of a criminal indictment is determined from its face." *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992). The indictment's allegations are assumed to be true and are viewed in the light most favorable to the government. *See Torkington*, 812 F.2d at 1354.

Defendants submit multiple arguments in support of dismissal. First, Defendants argue that the Court lacks statutory subject matter jurisdiction. Second, Defendants argue that the MDLEA cannot constitutionally be applied in this case because Defendants were arrested inside an EEZ. Third, Defendants argue that the Government violated Federal Rule of Criminal Procedure 5(a)(1)(b) because their presentment to a Judge was unnecessarily delayed. Fourth, Defendants argue that the Government violated Federal Rule of Criminal Procedure 5(b) because the criminal complaint was not promptly filed in this case. And finally, Defendants argue that the foregoing rule violations also run afoul of the outrageous government conduct doctrine. Each argument will be explored in turn.

### A.    ***The Court has statutory subject matter jurisdiction.***

The Government has sustained its burden to show that the Court has statutory subject matter jurisdiction over this case. Pursuant to the Maritime Drug Law Enforcement Act, 46 U.S.C. §§ 70501, *et seq.* ("MDLEA"), the United States has jurisdiction over vessels without nationality and a "vessel without nationality" is

defined as, among other things, a "vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel." 46 U.S.C. § 70502(d)(1)(B). The testimony of Officer Hernandez sufficiently proves that jurisdiction lies under the foregoing statute because he first asked whether any of the Defendants were the "master" or "person in charge" and, after all declined to identify themselves as such, he asked whether any of the Defendants wanted to make a claim of "nationality" or "registry" for the GFV. In response, Defendants did not make any claims of nationality or registry. The appropriate questions were asked, and the responses provided brought the GFV and its occupants within the jurisdiction of the United States. Defendants' argument to the contrary is therefore rejected and their Motion must be DENIED on that basis.

### B.  *The MDLEA applies in a foreign EEZ.*

It is undisputed that the GFV was seized within the Dominican Republic's EEZ. The legal significance of this fact, however, is disputed: Defendants contend that the MDLEA cannot apply within an EEZ because such application would exceed the authority granted to Congress by the Constitution to "define and punish . . . Felonies committed on the high Seas," which is the enumerated power that Congress relied on to enact the MDLEA. U.S. CONST., art. I, § 8, cl. 10; *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248 (11th Cir. 2012) ("[T]he Felonies clause is textually limited to conduct on the high seas[.]").

Unfortunately for Defendants, the Eleventh Circuit has defined the high seas to constitute "all waters which are neither territorial seas nor internal waters of the United States or of any foreign country." *United States v. McPhee*, 336 F.3d 1269, 1273 (11th Cir. 2003); *United States v. Campbell*, 743 F.3d 802, 812 (11th Cir. 2014) ("[W]e have repeatedly held that Congress has the power, under the Felonies Clause, to proscribe drug trafficking on the high seas."). A vessel outside the recognized 12-mile limit of a nation's territorial seas is a "vessel located within international waters" subject to the United States' jurisdiction under the MDLEA. *McPhee*, 336 F.3d at 1247 (holding that a vessel intercepted 17 miles from the Bahamas was "unambiguously in international waters at the time of its interception."). Furthermore, several courts, including some in this district, have held that a nation's EEZ remains part of the high seas and does not fall within the territorial waters of that nation. *See United States v. Alfonso*, No. 21-20306-CR, ECF No. 47 at 5-6 & n.2 (S.D. Fla. Nov. 22, 2021) (Altonaga, C.J.) (holding that the defendants were in the high seas when interdicted in the Dominican Republic's exclusive economic zone and collecting cases holding that territorial waters only extend to twelve nautical miles off the coast); *Dilbert v. United States*, No. 8:13-CV-2189-T-30MAP, 2013 WL 5408444, at *3 (M.D. Fla. Sept. 25, 2013) (holding that the petitioner "misinterpret[ed]" the United Nations Convention on the Law of the Sea and applying the "12-nautical-mile definition of territorial waters" as required by McPhee); *see also United States v. Beyle*, 782 F.3d 159, 167 (4th Cir. 2015) (holding that the exclusive

economic zone is "merely part of the high seas where that nation has special economic rights and jurisdiction").

Here, it is undisputed that Defendants were intercepted approximately 140 nautical miles south of the Dominican Republic.  Applying the foregoing precedent, it is clear that Defendants were captured on the high seas even though the GFV was seized within the Dominican Republic's EEZ.  Accordingly, Defendants' first argument is foreclosed by binding precedent, and so their Motion must be DENIED on that basis.

### C. *The Government violated Rule 5; however, the appropriate remedy is suppression – not dismissal.*

There is merit in Defendants' final arguments as to an unnecessary presentment; but we cannot grant them the remedy that they seek.  Federal Rule of Criminal Procedure 5(a)(1)(b) provides that a "person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise."  Accordingly, Defendants submit that the 22-day delay between their capture in the Caribbean and initial appearance in Miami constitutes an unreasonable delay necessitating the dismissal of the indictment.  Considering that the Eleventh Circuit has approved of a 49-day delay in a similar case, we are hesitant to agree with Defendants.  *See United States v. Cabezas-Montano*, 949 F.3d 567, 590-94 (11th Cir. 2020).  But it is not the total travel time that strikes us as meaningful; rather, only the circumstances of Defendants' last ten days at sea illustrate the "unnecessary delay" in their presentment.

Unnecessary delay arguments made pursuant to Federal Rule of Criminal Procedure 5(a)(1)(B) are analyzed in accordance with the *Purvis* factors. *See United States v. Purvis*, 768 F.2d 1237, 1238-39 (11th Cir. 1985); *Cabezas-Montano*, 949 F.3d at 591-92 (applying the *Purvis* factors). Accordingly, to determine whether the delay in presentment was unnecessary, the Court must consider: "(1) the distance between the location of the defendant's arrest in international waters and the U.S. port he was brought to; (2) the time between the defendant's arrival at the U.S. port and his presentment to the magistrate judge; (3) any evidence of mistreatment or improper interrogation during the delay; and (4) any reason for the delay, like exigent circumstances or emergencies." *Cabezas-Montano*, 949 F.3d at 591.

With respect to the first *Purvis* factor, the timeline and location associated with Defendants' arrest are not in dispute. Defendants were captured 140 miles south of the Dominican Republic. And it is worth noting at this juncture that, in these MDLEA cases, it is the policy of the USCG to complete its mission with its detainees on board rather than cancel its operational plans and then bring the detainees to the United States as quickly as possible. The USCG's predetermined route can be, and often is, indirect. It therefore understandably takes some time for detainees like Defendants to reach our shores. Here, the record reflects that it took the *Friesland* seven days to rendezvous with the *Tezanos* for the purpose of transferring Defendants off the Dutch vessel. It then took the *Tezanos* a few more days to reach a Puerto Rican port. Had Defendants been presented to a Magistrate Judge in Puerto Rico at that time, we would have very little trouble concluding that this factor does not weigh

12

against the Government because the USCG covered the distance between capture and arrival in a United States port in a reasonably timely fashion.  But that is not what happened.  Instead of disembarking Defendants in Puerto Rico when the *Tezanos* was scheduled to arrive in port, the Government engaged in a complicated series of transfers to avoid Puerto Rican waters altogether.

With respect to the second *Purvis* factor, the time between Defendants' ultimate arrival in Florida and their presentment was under 24 hours.  They arrived in Fort Lauderdale in the afternoon and were brought to their initial appearance in Miami the following morning.  Under the circumstances, this discrete one-day delay was reasonable and therefore cannot weigh against the Government.

The real issue here arises when we consider the third and fourth *Purvis* factors. Instead of bringing Defendants to Puerto Rico where they could have undoubtedly been turned over to the custody of the DEA or the Marshals, either of whom could have promptly brought Defendants before a federal judge by April 10, 2023, at the very latest, Defendants spent 12 days being shuffled from the *Tezanos* to the *Billings* to the *Wichita* to the *Tezanos* and then to the *Thetis* before meeting Detective Hosch in Guantanamo Bay.  Based upon the record before us, all of these transfers were accomplished for two reasons: (1) to avoid the activation of Defendants' constitutional rights on April 8, 2022; and (2) to give Detective Hosch the opportunity to interrogate Defendants *before* a Judge advised them of their rights, informed them of their

charges, and appointed a lawyer for their defense.  Accordingly, these factors weigh heavily against the Government.[2]

All things considered, the reason for the delay was essentially to acquire additional evidence the prosecution in a manner that strategically evades the protections afforded by our constitution through wasteful expenditure of precious federal resources.  Thus, we find that the delay in presentment here was unnecessary and therefore violated Federal Rule of Criminal Procedure 5(a)(1)(B).

The remedy for this violation is not dismissal of the indictment, however, and only suppression of the evidence obtained pursuant to the delay would be warranted. *See Purvis*, 768 F.2d at 1238 ("[T]he purpose of Rule 5(a) is to prevent oppressive police interrogations and other 'third-degree' tactics before bringing the accused in front of an officer of the court; the remedy was the exclusion of evidence which had been gained during the delay by the use of such tactics.") (citing *Mallory v. United*

---

[2]    Defendants also submit that Federal Rule of Criminal Procedure 5(b), which requires a Judge to "promptly" make an independent probable cause determination, was violated because the Fourth Amendment requires the Government to secure a criminal complaint within 48 hours of arrest. *See County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).  Given the post-pandemic realities of remote work and the undersigned magistrate's substantial experience processing electronic criminal complaints, it does indeed seem counterintuitive that the Government cannot (1) decide where to prosecute an MDLEA case and (2) acquire a criminal complaint within 48 hours of arrest. Nevertheless, Defendants' argument is foreclosed because Defendants are neither citizens nor residents of the United States; thus, having been arrested in international waters, controlling precedent provides that they do not have Fourth Amendment rights and are therefore ineligible to claim the benefits of *McLaughlin*'s 48-hour rule. *See, e.g., Cabezas-Montano*, 949 F.3d at 593-94.  In other words, the decision to transfer Defendants off the *Tezanos* on April 8, 2022, and thereby avoid the territorial waters of the United States until after the criminal complaint was filed on April 12, 2022, requires us to reject this argument.

*States*, 354 U.S. 449, 451-54 (1957)); *United States v. Bibb*, 194 F. App'x 619, 623 (11th Cir. 2006) ("In fact, we have never recognized dismissal of the indictment as a property remedy for a Rule 5 violation."). Defendants' reliance on Federal Rule of Criminal Procedure 48(b) is therefore misplaced. Accordingly, we hold that the Motion should be GRANTED in part because the Court must suppress any statements that Defendants made to Detective Hosch on April 20, 2022.

Defendants alternatively submit that the indictment should be dismissed under the outrageous conduct doctrine. They correctly observe that, in 1973, the Supreme Court said that we "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," but this Court cannot agree that this is such a case. *See United States v. Russell*, 411 U.S. 423, 431-32 (1973). We cannot say that the record in this case, though economically wasteful and needlessly harsh towards the detainees being shuffled around the Caribbean, presents a due process violation. Accordingly, this aspect of the Motion is due to be DENIED on that basis.

### III.   CONCLUSION

For the foregoing reasons, the Motion should be **GRANTED in part** and **DENIED in part**. The only relief due to Defendants relates to the suppression of any statements Defendants made to Detective Hosch, pursuant to a Federal Rule of Criminal Procedure 5(a)(1)(B) violation. In all other respects, the Motion should be denied.

The parties shall have fourteen (14) days from the date of this Report and Recommendation within which to file objections, if any, with the District Judge assigned to this case. Failure to timely file objections shall bar the parties from de novo determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 24th day of April, 2023.

EDWIN G. TORRES
United States Magistrate Judge